EDWARD S. F. RANDOLPH, PROSECUTOR, v. CITY OF RAHWAY, BOROUGH OF GARWOOD, BOROUGH OF ROSELLE PARK, BOROUGH OF KENILWORTH, TOWNSHIP OF CRANFORD, TOWN OF WESTFIELD, TOWNSHIP OF SPRINGFIELD, TOWNSHIP OF CLARK, AND THE TOWNSHIP OF WOODBRIDGE, MUNICIPALITIES, ETC., DEFENDANTS.

Argued December 17, 1929—Decided January 22, 1930.

For the prosecutor, *Martin P. O'Connor* and *J. Edward Ashmead.*

For the defendant joint meeting, *Francis V. Dobbins* and *Conover English.*

For the defendant city of Rahway, *David Armstrong.*

The matter was, under the statute, brought on before and the opinion is by

CASE, J. In November, 1928, the prosecutor, Edward S. F. Randolph, was a member of the city council of Westfield and was elected permanent chairman of the joint meeting of the said town of Westfield and eight other municipalities acting under an act of the legislature entitled "An act to authorize two or more municipalities in this state to jointly construct and maintain outlet or trunk sewers," approved March 15th, 1899, and of the acts amendatory thereof and supplemental thereto. His term of office as a member of the city council of Westfield expired December 31st, 1928, and he did not run for re-election. He continued, nevertheless, to act as permanent chairman of the joint meeting and no question was raised as to his eligibility so to do until October, 1929. On October 24th, 1929, the joint meeting passed a resolution declaring the office of chairman vacant and proceeded to elect Roger C. Aldrich to fill the alleged vacancy. A writ of *certiorari* was allowed, directing the municipalities and the joint meeting of said municipalities to certify the action of the joint meeting in declaring the office vacant and in electing Aldrich to fill the vacancy.

Counsel for the prosecutor submit in their brief that the only question involved is the legality of the action of the joint meeting in attempting to remove the prosecutor from an office in violation of its own organic law expressly providing that the permanent chairman shall hold his office until the final completion of the work contracted to be performed by the municipalities and shall be entitled to receive compensation from the beginning of his term until the completion of such public improvement so contracted for. Nevertheless, it is to be noted that the record required by the writ and returned in response thereto embraces, in addition to the resolution declaring the office vacant, the action of the joint meeting in electing Aldrich to fill the vacancy. To the extent of the issue thus created, and in the light of the proofs submitted, the controversy appears to partake of the nature of a contest for public office.

The fundamental question is the authority of the joint meeting to declare the office of permanent chairman vacant, but a preliminary question must first be considered, namely, whether the writ of *certiorari* can be resorted to by prosecutor for the purpose of determining that issue. An analysis of the decisions in this state discloses that two principles have been quite clearly adopted. One is that where a person is in possession of an office and the governing body unlawfully elects a successor and thereby threatens to disturb him in the enjoyment of his term, *certiorari* is the appropriate remedy to review such action, and the other is that where one claims right and title to an office from which he has been ousted and which is occupied by another, his remedy is by *quo warranto.* In *Bradshaw* v. *City Council of Camden,* 39 *N. J. L.* 416, the leading case on the subject in this state, Mr. Justice Van Syckel said: "If the title of a claimant in possession of the office was to be tried, it would be necessary to resort to a *quo warranto,* but the relator in this case being in possession of the office, the proceedings taken by the common council, threatening to disturb him in the enjoyment of it, can be reviewed only by *certiorari.* The object of prosecuting a *quo warranto* is to have one in possession adjudged guilty of usurpation. The plaintiff in this case sues for no such end; his only purpose is to remove from his way a proceeding which he apprehends may be used unlawfully to eject him." The same principle was upheld in *Fitzgerald* v. *New Brunswick,* 47 *Id.* 479; *affirmed,* 48 *Id.* 457; and by the recital of proofs given in the brief of counsel, particularly at page 471 of 48 *N. J. L.,* it appears that the prosecutors to whom relief was accorded under writ of *certiorari* had refused to surrender their office and had acted, since the attempted removal, the same as before. Likewise in *Moore* v. *Borough of Bradley Beach,* 87 *Id.* 391; *Murphy* v. *Freeholders of Hudson,* 91 *Id.* 40; *affirmed,* 92 *Id.* 244, and *Spencer* v. *Middlesex Tax Board,* 95 *Id.* 5, the facts were that the respective prosecutors continued to hold their several offices, were apprehensive that the objectionable proceedings would be used to eject or disturb them in the tenure of office and therefore desired to remove a proceeding which it was

apparent would be unlawfully used for the purpose of ejecting the then incumbent. In *Hansen* v. *Costello,* 126 *Atl. Rep.* 403; 2 *N. J. Mis. R.* 961, it was held that "prosecutor has mistaken his remedy, which is by *quo warranto* and not *certiorari.* Where one claims the right and title to an office from which he has been ousted and which is occupied by another, the remedy is by *quo warranto.*" See, also, *Turtur* v. *Brokaw,* 134 *Atl. Rep.* 747; 4 *N. J. Mis. R.* 870. Likewise in *Seaman* v. *Strollo,* 105 *N. J. L.* 570, a recent decision by the Court of Errors and Appeals, the learned decision by Mr. Justice Parker, in setting aside the attempted appointment of Strollo under a writ of *certiorari,* calls attention to the fact that the prosecutor was in occupancy of the disputed office.

It therefore becomes necessary to determine whether the prosecutor is or is not in occupancy of the office of permanent chairman of the joint meeting. His own testimony is that he was in the chair presiding at the time of the passage of the resolution declaring the office vacant and of the election of Aldrich, and that he then said that he did not feel that the action of the joint meeting changed his status as permanent chairman in any manner whatsoever; that after the election of Aldrich someone raised the question as to whether the newly elected chairman ought not to occupy the chair in which the prosecutor sat; that the counsel stated that "it didn't make any difference where the chairman sat at the joint meeting," and that for the rest of the meeting the prosecutor continued, physically, to occupy that particular chair; that subsequently the prosecutor had attended all of the meetings of the joint meeting except one but had not attended any of the executive committee meetings; that he had written communications to the joint meeting to maintain his position as chairman; that he retained possession of some papers and some keys; that he engaged in certain inspections of right of way and the like but made no report regarding the same to the joint meeting. It is otherwise in evidence that Aldrich, having been sworn in at the meeting on October 24th, at once took charge of and conducted the meeting as chairman; that he presided at all subsequent

joint meetings and at all of the executive meetings, and in so doing always occupied the official chair; that he signed all checks and warrants for payment of money, and all orders for work and the printed proposals for bids for new work; that he presided over the opening of bids for work involving approximately $500,000 in value; that the signature cards filed with the banks bore his signature and that the checks of the joint meeting with his signature were honored by the banks; that he consulted with the engineers, functioned at the office, received daily reports from the field representative of the progress of the work and procured rights of way, either alone or with assistance; that at least some of the papers and one of the keys retained by the prosecutor had been returned. By the minutes of the meetings of the joint committee held subsequent to October 24th, 1929, that is to say, on October 31st, November 14th and December 2d, it appears that a large volume of business has been transacted and that Aldrich has been in the chair exercising, without interference, all of the functions of the chair. He not only presided but assumed the prerogatives of the chair outside of merely conducting the meeting, as, for instance, on October 31st in the appointment of Mr. Park, of Rahway, as chairman of the committee on section No. 2, which appointment was confirmed by the joint meeting, and on November 14th in the appointment of Mayor Towl as chairman of the specifications committee, which appointment was also confirmed by the joint meeting. The business done, as disclosed by the minutes, includes the adopting of a set of rules, receiving of reports of activities by the engineers and others, negotiations with municipalities and public utilities, the giving of directions to bank depositaries as to the payment of funds, disposition of matters relating to outstanding contracts, acquisitions of rights of way, payments of salaries, bills and engineers' monthly estimates on contract obligations, election of treasurer, employment of auditor, a requisition of $100,000 on the member municipalities, the receiving and opening of bids for work, the return of deposit checks to the high bidders, &c., all of which was done apparently without contest or opposition except a letter or two from Mr. Randolph, wherein the latter made

refusal to surrender certain papers and asserted his right to the office of chairman.

It is difficult to imagine how the *de facto* occupancy by Aldrich could have been more full. Randolph protested; he retained (as he claims) certain articles, the importance of which does not appear; and he did some casual field work which was not brought to the attention of the joint meeting. Meanwhile, the joint meeting was functioning smoothly, efficiently and completely under Aldrich's chairmanship. I am necessarily, as it seems to me, brought to the conclusion that, under the cases and the proofs, Randolph was "out" and Aldrich was "in." The only judicial expression in this state that, on the surface, seems not to be in harmony with this view, is an observation by that eminent jurist, Mr. Justice Garrison, in *Leeds* v. *Atlantic City,* 52 *N. J. L.* 332 (at *p.* 337), in which he says, referring to the reason for the rule making the fullness of the office *de facto* the test as to whether *quo warranto* is or is not the only remedy:

"There is, however, a class of cases in which this reason for the rule is wanting. I refer to those cases in which the facts before the court, or within its judicial knowledge, show that the relator was in office *de jure et de facto,* and that the defendant, while claiming to be in *de facto,* can make no claim to be in *de jure.* Here the relator is not called upon to test the title to the office, for that is not in dispute. The office is not *de facto* full against him, unless by his conduct he elect to consider himself out. In contemplation of law, his title to the office *de jure* draws to it the possession *de facto,* as in cases where simultaneous acts of occupancy are exercised by contestants over a legal title. In such cases there is nothing to be tried by *quo warranto.* The law being settled, and the facts undisputed, the duty of the court is clear."

Counsel for the prosecutor, arguing from this language, contends, in effect, that where the prosecutor is found to be entitled *de jure* to the office and has steadfastly asserted his right thereto, he may obtain relief without resorting to *quo warranto,* even though he to all intents and purposes is out of, and a usurper is in, the possession of the office. But it will be noticed that by this language it is the conduct and not

the words of the prosecutor, which manifest his attitude and that the alternative procedures under discussion by the learned jurist are *mandamus* and *quo warranto,* not *certiorari* and *quo warranto.* I do not regard the language of this decision as pertinent to the instant case, nor, indeed, do I consider that the law as expressed in that case is at variance with the findings now reached.

The trend of the decisions applied to the facts of the case lead to the construction that *quo warranto* and not *certiorari* constitutes the proper procedure. I am, however, impressed by the substance of the meritorious question involved in this case and consider that the proceeding should not be dismissed because the prosecutor has mistaken his remedy. Section 23 of the Practice act of 1912; *Martin* v. *Freeholders of Essex,* 85 *N. J. L.* 151; *Young* v. *Stafford,* 86 *Id.* 422.

The prosecutor is given leave to amend his proceedings from *certiorari* to *quo warranto* and may be heard on motion on due notice with respect thereto.